# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Qixin Sun,

      **Plaintiff,**            :        **Case No. 2:17-cv-1039**

      **v.**                     **Judge Sarah D. Morrison**
                             :        **Magistrate Judge Kimberly A. Jolson**

Department of Veterans Affairs,

      **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment. (ECF No. 18.) Plaintiff filed an Opposition to the Motion (ECF No. 21), and Defendant filed a Reply (ECF No. 24). The matter is now ripe for decision.

## I. STATEMENT OF THE FACTS

Plaintiff Qixin Sun was born in China and received his medical degree in China. (Sun Dep. 28:6–22; 38:1–8, ECF No. 17.) After graduating medical school, Dr. Sun immigrated to the United States where he became board-certified in internal medicine and obtained a license to practice medicine in Ohio. (*Id.* 28:7–29:22, 43:18–22.) In 2005, Dr. Sun began working for the Defendant, the United States Department of Veterans Affairs (the "VA"), at the VA's Chalmer's P. Wylie Ambulatory Care Center (the "Columbus VA"). (*Id.* 48:8–11.)

On December 6, 2009, Dr. Sun filed an Equal Employment Opportunity ("EEO") complaint against the VA alleging that he was being discriminated against on the basis of his national origin (the "2009 Complaint"). (*Id.* 210:4–10, 212:18–22.) On February 23, 2011, the EEOC granted summary judgment for the VA, finding no discrimination. (ECF No. 21-3, at 2.)

Dr. Sun appealed, and the administrative proceedings related to this complaint concluded with the denial of Dr. Sun's appeal on May 1, 2013. (*Id.* at 3, 5.)

Beginning in August 2010, and until the time of his resignation, Dr. Sun was supervised by the chief of primary care, Dr. Edward Bope. (Sun Dep. 110:16–23.) Dr. Bope supervised approximately 10-12 other primary care physicians at the Columbus VA. (*Id.* 68:6–23; 111:19–112:9.) Approximately half of these physicians were born outside of the United States, including physicians born in India, Pakistan, and Korea. (*Id.* 115:6–16.) Dr. Sun was the only Chinese physician. (*Id.* 115:16–22.) Beginning in March 2012, Dr. Sun's second level supervisor was the Columbus VA Chief of Staff, Dr. Marc Cooperman. (Marc Cooperman Decl. ¶¶ 1–2, ECF No. 18-1.)

## A.     The Bradycardic Patient

On September 4, 2012, Dr. Sun treated an elderly patient (the "Patient") who had come into the Columbus VA after suffering a fall. (Edward Bope Decl. Ex. A, ECF No. 18-2.) During this visit, the Patient's pulse was measured to be very low at thirty-seven beats per minute. (ECF No. 18-5, at 44.) A low pulse is a condition known as bradycardia, which refers, at the very least, to a pulse below forty beats per minute.[1] Two days later, the Patient returned and his pulse was still very low. (*Id.* at 49.)

The evidence as to whether Dr. Sun was aware of the Patient's low pulse is mixed. The medical records for both appointments documented the Patient's pulse rate. (*Id.* at 44, 49.) Dr. Sun acknowledges that he signed these medical records and that by signing a patient's chart he is

---

[1] In his deposition, when he was asked what constitutes bradycardia, Dr. Sun stated: "Below 60" beats per minute. (Sun Dep. 269:15–19.) When later confronted with the Patient's specific vitals, Dr. Sun pivoted and said that "40 . . . is the line." (*Id.* 287:20–22.) For purposes of this Opinion, the difference is not material, and in an effort to construe the facts in the light most favorable to Dr. Sun, the Court assumes that the lower number—forty— is the standard.

responsible for that patient's visit, but he does not recall whether he reviewed the Patient's vital signs before signing the chart. (Sun Dep. 281:9–11, 282:17–24, 290:2–7; ECF No. 18-5, at 46, 50.) The Patient's wife recalled that during the first visit, the nurse reported the Patient's pulse to Dr. Sun and that Dr. Sun remarked that the pulse was very low. (Bope Decl. Ex. A.) During the second visit, the treating nurse recalls that she verbally notified Dr. Sun of the Patient's low pulse. (ECF No. 18-5, at 121.) Dr. Sun denies being notified of the low pulse on either occasion, and he contends that if he had been aware of it, he would have ordered an EKG. (ECF No. 18-6, at 24:10–26:9; Sun Dep. 289:18–23.)

On September 30, 2012, the Patient's wife sent an email to the Columbus VA (the "Patient's Complaint") complaining that Dr. Sun had ignored her husband's low pulse on the two aforementioned visits. (Bope Decl. ¶ 4, Ex. A.) The wife reported that her husband had an appointment with his urologist on September 27, 2012, three weeks after he had seen Dr. Sun, when the urologist ordered him transported to the emergency room due to a dangerously low pulse. (Id.) At the emergency room, a cardiologist determined that the Patient was in immediate need of a pacemaker, and the Patient was taken by ambulance to a hospital. (Id.)

On October 1, 2012, Dr. Bope referred the Patient's Complaint to the Columbus VA Risk Manager, Deborah Garza, for the initiation of a confidential review by the Peer Review Committee (the "PRC").[2] (Id.) The PRC undertakes a confidential medical quality assurance process when there is a question as to whether a physician met the standard of care. (Id. ¶ 4.) Due to a work backlog, Ms. Garza did not begin processing the Patient's Complaint until March 30, 2013, and the Patient's Complaint was not reviewed by the PRC until May 2, 2013. (Deborah Garza Decl. ¶¶ 3-4, ECF No. 18-3.)

---

[2] The PRC's findings are protected by law and were not a part of discovery. *See* 38 U.S.C. § 5705 (restricting disclosure of records and documents created by VA through its medical quality-assurance program).

After the PRC's preliminary evaluation of the Patient's Complaint, on May 15, 2013, Ms. Garza drafted a letter on behalf of Dr. Cooperman notifying Dr. Sun of the PRC's initial evaluation and inviting him to attend one of the upcoming PRC meetings. (*Id.* ¶ 4.) On June 20, 2013, Dr. Sun attended a PRC meeting during which the PRC further reviewed the Patient's Complaint. (*Id.*) Subsequent to this meeting, Dr. Cooperman, as chair of the PRC, asked Ms. Garza to research the appropriate action for a VA facility to take when the information provided to the PRC "raises a significant concern." (Cooperman Decl. ¶¶ 1, 5; Garza Decl. ¶ 5.) Ms. Garza consulted with the VA's National Director of Risk Management, who recommended that the Columbus VA initiate a management review. (Garza Decl. ¶ 5.) A management review is a third-party review by an expert to assess whether a medical provider met the standard of care. (Bope Decl. ¶ 11.) In line with this recommendation, a management review of the Patient's Complaint was conducted by Dr. Carl Bixel, a Primary Care reviewer at the Cincinnati VA. (Garza Decl. ¶ 6.)

On July 12, 2013, Dr. Bixel provided his conclusions to the Columbus VA. (*Id.* ¶ 7.) Dr. Bixel found that in hindsight the Patient should have been referred to the emergency room because he was at a very high risk of falling again, but that the available information did not allow him to decide who was necessarily at fault. (Bope Decl. Ex. D, at 6.) Dr. Bixel's conclusion regarding the Patient's first visit, on September 4, 2012, was as follows:

> On a busy day, a provider on a well functioning [sic] team might rely on the nurse for basic information and assume that a patient who appeared well had simply tripped and was there to have his foot injury addressed. In this scenario, it would be very easy for a competant [sic] provider to do exactly what was done. On the other end of the spectrum, if the provider was aware of the vital signs and did not perceive any problem, then the provider did not meet the standard of care.

(*Id.* at 7.) Regarding the Patient's second visit, on September 6, 2012, Dr. Bixel concluded:

[T]here is reason to suspect that systems issues may have interfered with the patient's evaluation. Specifically, the patient's evaluation was initially performed by a resident. Although attending physicians have ultimate responsibility for the care of patients seen by residents, in practice, the attendings remain dependent on the residents to gather and present relevent [sic] information. The available documentation does not provide any insight into what information was conveyed from the resident to the attending.

(*Id.* at 8.) Dr. Bixel's bottom-line conclusions were as follows:

[I]t is likely that multiple systems issues contributed to a delay in treatment of the bradycardia. [] Provider-specific issues may have contributed to the delay, but no firm conclusions can be drawn with the available information. [] With the above caveats, it is still the expectation in the VA under the current system, that providers will manage their teams and trainees in such a way that critical information will be effectively communicated. Based on the limited information available, it appears that Dr. Sun did not meet that expectation.

(*Id.* at 9.)

###    B.    Additional Concerns by the VA about Dr. Sun

Around the time of the Columbus VA's procedures surrounding the Patient's Complaint, Drs. Bope and Cooperman began to develop other concerns about Dr. Sun, including regarding the accuracy of his medical documentation. In early 2013, Dr. Cooperman called several of Dr. Sun's patients to question them as to the care that they had received. (Cooperman Decl. ¶ 2.) Three of those patients reported receiving no examinations at all even though Dr. Sun had documented full examinations on their charts. (*Id.*)

In late April and early May 2013, Dr. Bope called seven of the nine patients whom Dr. Sun had seen on April 22, 2013. (Bope Decl. ¶¶ 6–7.) Based on these phone calls, Dr. Bope determined that Dr. Sun had documented examinations on each of these patients' charts that he had not performed. (*Id.* ¶ 7.) Dr. Bope also called two patients who had submitted complaints to the VA's Patient Advocate about Dr. Sun. (*Id.* ¶ 8.) While Dr. Sun had documented that he had conducted examinations on these patients, one reported receiving no examination at all and the other reported an examination that was less comprehensive than Dr. Sun had documented. (*Id.*)

On May 8, 2013, Dr. Bope met with Dr. Sun, who denied conducting incomplete examinations or documenting examinations that he did not perform. (*Id.* ¶ 9.) Dr. Sun also said that he may need to take some time off from work due to the stress of Dr. Bope's scrutiny. (*Id.*)

Between October 1, 2012, and July 30, 2013, the Columbus VA's Patient Advocate received twenty-five comments about Dr. Sun. (ECF No. 18-5, at 24–29.) This number was the highest of the primary care providers at the Columbus VA (although the second highest total was twenty-three), with the average number of comments totaling slightly less than twelve and the median number being fourteen. (*Id.* at 24.) It is difficult to fully contextualize these numbers, because they include *any* comments about a particular provider—both positive and negative. (ECF No. 18-7, at 6:11–14.) The Court only has full information about the comments pertaining to Dr. Sun. (ECF No. 18-5, at 25–29.)

Of the twenty-five comments mentioning Dr. Sun, twenty-four are complaints. (*Id.*) While not all of them are necessarily Dr. Sun's fault or can reasonably be attributed to his care, they share some commonalities. Eleven patients complained that Dr. Sun did not listen to them or that they felt that Dr. Sun did not care about them. (*Id.*) Two patients complained that Dr. Sun never examined them, including one who said that Dr. Sun never examined his/her feet despite the patient twice complaining about foot pain. (*Id.* at 26, 29.)

### C.      Disciplinary Action

On May 23, 2013, Dr. Bope notified Dr. Sun that due to his concerns that Dr. Sun was improperly documenting patient examinations, he was proposing that Dr. Sun be suspended for twelve days (the "Notice of Proposed Suspension"). (Bope Decl. ¶ 10, Ex. B.) This proposed suspension did not go into effect and was rescinded on August 5, 2013, due to the events described below. (*Id.* ¶ 10.) On June 13, 2013, Dr. Sun submitted an EEO complaint (the "June

2013 Complaint") alleging that the Notice of Proposed Suspension was issued in retaliation for his 2009 Complaint. (Sun Dep. 207:5–19; ECF No. 21-5, at 1.) The June 2013 Complaint also contains allegations of national origin discrimination. (ECF No. 21-5, at 1.)

On July 22, 2013, Dr. Sun was placed on paid administrative leave. (Cooperman Decl. ¶ 8.) Darwin Goodspeed, the Acting Director of the Columbus VA, summarily suspended Dr. Sun's clinical privileges pending review of the allegations that his physical examinations were inadequate and improperly documented, that his medical decision making was poor, and that an excessive number of patient complaints had been lodged against him. (Sun Dep. Ex. I, at 1, ECF No. 17-9.) A summary suspension would allow the Columbus VA to conduct additional investigation into their concerns while removing Dr. Sun from patient care. (Cooperman Decl. ¶¶ 6–8; Bope Decl. ¶¶ 13–15.) One week after the suspension began, Dr. Sun sent a letter to Acting Director Goodspeed complaining about Dr. Bope and accusing Dr. Bope of fabricating the allegations against him. (ECF No. 18-5, at 183–85.)

The day after Dr. Sun was placed on leave, on July 23, 2013, Dr. Cooperman appointed Dr. George Mitchell Kennedy to chair the Professional Standards Board ("PSB"), which was tasked with conducting an independent review of the charges giving rise to Dr. Sun's summary suspension and providing its findings, conclusions, and recommendations to the Executive Committee of the Medical Staff (the "MEC"). (George Mitchell Kennedy Decl. ¶¶ 3–4, ECF No. 18-4.) On August 16, 2013, the six members of the PSB determined that some of the allegations against Dr. Sun were meritorious but that the evidence was insufficient to demonstrate a pattern of misconduct. (Sun Dep. Ex. I, at 3.) Specifically, the PSB found: there were some inconsistencies in Dr. Sun's documentation of his patients' physical examinations, Dr. Sun had excessive complaints in comparison to his colleagues, and there existed evidence of poor medical

decision making in the case of the Patient. (*Id.*) While the PSB found there to be insufficient grounds for terminating Dr. Sun's privileges, it unanimously recommended that his privileges be reinstated with "intensive oversight." (*Id.*; Kennedy Decl. ¶ 8.) The PSB purposefully left "intensive oversight" open for interpretation by the VA's Credentialing and Privileging Committee ("CPC"), an independent committee that reports to the MEC on credentialing and privileging issues. (Kennedy Decl. ¶¶ 8, 11.)

Beginning on August 22, 2013, the ten-member MEC met over two days to consider the PSB recommendation, the status of Dr. Sun's privileges, and whether to recommend to the Director of the Columbus VA, Keith Sullivan, that Dr. Sun's privileges be restored, terminated, or subject to limitation. (ECF No. 18-6, at 1, 2:3–17; ECF No. 18-7, at 1, 21:22–22:9.) The MEC included Dr. Cooperman, Dr. Bope, Dr. Steven Wanamaker (Staff General Surgeon), Dr. Michael Kenny (Chief of Pathology and Laboratory Medicine), Dr. Gregg Kuck (Chief of Pharmacy), Dr. Julie Henry (Chief of Eye Care Services), Nurse Practitioner Deborah Formella (Home Based Primary Care Program Coordinator), and Social Worker Deborah Wilson (Chief of Care Management and Social Work Service). (ECF No. 18-6, at 1; Cooperman Decl. ¶ 11.)

On the first day of the MEC meeting, Dr. Sun was given an opportunity, along with his union representative, to defend himself against the charges. (ECF No. 18-6, at 21:5–35:1.) When asked about the Patient, Dr. Sun stated that he did not "feel sorry" about the situation because he surmised that other members of the medical team should have been aware, and recognized the danger, of the Patient's low pulse. (*Id.* 22:22–30:5.) Dr. Sun blamed the nurse, the Patient, and the other doctors who had cared for the Patient but took no responsibility himself. (*Id.*; *see also* Def. Opp. to Pl. Mot. Summ. J., at 11–12, ECF No. 21.) Dr. Sun also explained that he was not concerned with the particular details of the fall and assumed based on his past experiences with

the Patient that the Patient had not been using his cane or walker and that he had "just fall[en] down." (ECF No. 18-6, at 28:12–29:8.) Because of the fall, Dr. Sun was primarily concerned that the Patient might have had a leg clot. (*Id.* 29:9–30:5.)

The MEC was highly critical of Dr. Sun's statements and of his prior conduct. Drs. Bope and Cooperman were concerned that Dr. Sun did not understand how to conduct a proper physical examination. (*Id.* 5:11–6:2, 18:15–19:3.) Dr. Bope was also critical of Dr. Sun's failure to delve deeper into the reason for the Patient's fall. (*Id.* 41:4–16; *see also* Bope Decl. ¶ 12.) It troubled Drs. Wanamaker and Kenny that Dr. Sun faulted the Patient for not diagnosing his own problem. (ECF No. 18-6, at 38:5–39:3.) Dr. Wanamaker was also concerned that Dr. Sun was not adequately examining his patients and that he had not seemed to have learned from what happened with the Patient. (ECF No. 18-7, at 17:9–18:8.) Ms. Formella worried that Dr. Sun was shirking responsibility for caring for a patient of his and that Dr. Sun lacked a plan to ensure that a situation like the Patient's did not recur. (ECF No. 18-6, at 39:16–21; ECF No. 18-7, 2:20–3:18.) Drs. Kenny and Kuck were bothered by a consistent pattern in Dr. Sun's patient complaints that he did not examine them, he did not listen to them, and he did not care about them. (ECF No. 18-7, at 5:2–21.) Ms. Wilson found Dr. Sun's lack of accountability and lack of clinical thinking disquieting. (*Id.* 8:8–22.) Dr. Henry was troubled by the inadequacy of Dr. Sun's physical examinations, the quantity (and gravity) of the complaints against him, and his lack of accountability. (*Id.* 9:10–10:12.)

During the second day of the MEC meeting, Dr. Bope made some comments related to foreign-trained doctors in general and Dr. Sun's training in particular. First, amidst various criticisms of Dr. Sun, Dr. Bope said:

> I've worked with a number of international doctors over my time as a teacher, and what I found consistently was that they are very strong in things like the physical

exam and diagnostic, because they really have studied that thing—those things
very well. What they generally lack, then, is applying that to the modern
technology that we have in the United States. So what concerns me is, I can't
even verify that his basic medical education is adequate, in addition to some
exams that demonstrate that it's not adequate. So I'm concerned about his
preparation to become a physician and his continuing practice as a physician.

(*Id.* 11:4–19.) A short while later, Dr. Bope commented on Dr. Sun's communicative abilities:

And the other piece, which I don't know exactly how to deal with, are his English
skills . . . good enough to allow him to serve as a student with someone that's a
preceptor? I find him very difficult to understand. Part of it is English, but part of
it is that the thoughts sort of collide and go different directions. He jumps from a
topic to a topic. That's a communication style that I'm not sure is just English. I
do find him difficult to understand and so do patients to some degree.

(*Id.* 16:17–17:6.)

At the end of the meeting, the MEC voted 8-0 by secret ballot, with Drs. Bope and

Cooperman abstaining (based on their prior involvement in the disciplinary proceedings), to

recommend that Dr. Sun's clinical privileges be terminated. (*Id.* 35:7–36:16.) However, Director

Sullivan overruled the MEC's recommendation and instead concurred with the PSB's

recommendation to restore Dr. Sun's privileges, subject to oversight. (Cooperman Decl. ¶ 13.)

On August 30, 2013, the eight-member CPC voted 7-0, with Dr. Bope abstaining, to

approve a ninety-day Focused Professional Practice Evaluation ("FPPE") for cause pursuant to

Article VII of the Columbus VA Bylaws (the "Bylaws"). (Kennedy Decl. ¶¶ 12, 14; Sun Dep.

Ex. L, at 1–3, ECF No. 17-12.) The seven voting members were all medical providers at the

Columbus VA, and four of them were on neither the PSB nor the MEC. (Kennedy Decl. ¶ 14;

ECF No. 18-6, at 1; Sun Dep. Ex. I, at 3.) Section 7.04(4) of Article VII of the Bylaws provides

that a for-cause FPPE "may require direct supervision and appropriate action on privileges,"

including a summary suspension, "where there is concern regarding competence and the care

being rendered to patients." (Kennedy Decl. Ex. A, at 30.) The FPPE set forth various ways to

monitor and examine Dr. Sun's clinical skills, documentation skills, and medical knowledge. (Sun Dep. Ex. L, at 2.)

Director Sullivan notified Dr. Sun that he was going to be returned to duty effective September 3, 2013, and would be placed on the FPPE. (Sun Dep. Ex. J, ECF No. 17-10.) However, Dr. Sun did not comply with the FPPE. (Sun Dep. 265:25–268:15.) He partook in the FPPE for two days before calling off work, saying that he was so stressed out that he thought he was a danger to his patients. (*Id.* 191:18–192:5.) Dr. Sun's psychiatrist affirmed this, diagnosing him with an adjustment disorder with anxiety and finding that his condition could impair his ability to safely practice medicine. (Sun Dep. Ex. C, ECF No. 17-3.)

On September 12, 2013, Dr. Sun filed another EEO complaint, this time on the grounds of national origin discrimination. (Sun Dep. 220:7–221:9; Sun Dep. Ex. H, ECF No. 17-8.) On September 18, 2013, Dr. Sun wrote to Director Sullivan to object to being placed on the FPPE. (Sun Dep. Ex. L, at 5.) On September 20, 2013, Dr. Cooperman instructed Dr. Sun that the FPPE was necessary to alleviate the concerns raised by the PSB. (*Id.* at 6.) Dr. Cooperman notified Dr. Sun that he would need to satisfactorily complete the ninety-day FPPE in order to return to practice and that days on which he was absent would not count towards the ninety-day term. (*Id.*)

In late September 2013, Dr. Sun applied for an opening at the Chillicothe VA in order to remove himself from the Columbus VA's review. (Sun Dep. 293:23–294:24.) Dr. Sun had an interview at the Chillicothe VA and thought he had been hired, although he never received anything in writing. (*Id.* 299:13–300:4, 303:17–19.) On October 9, 2013, counsel for Dr. Sun wrote to the Columbus VA requesting a transfer to another VA facility. (Nicholas Kennedy Decl. Ex. A, ECF No. 18-8.) On October 16, 2013, the VA's Office of Regional Counsel responded

that Dr. Sun would not be transferred and that he was expected to return to work at his job in Columbus. (*Id.* Ex. B.)

All VA physicians must renew their clinical privileges every two years, and as a part of this renewal process, a provider must include documentation, signed by a physician, that he/she is in adequate physical and mental health to perform his/her job requirements. (Cooperman Decl. ¶ 19.) Pursuant to this policy, Dr. Sun was obligated to renew his privileges prior to January 18, 2014. (*Id.* ¶ 21.) Throughout November and December, Dr. Sun was reminded that he needed to renew his privileges. (Sun Dep. 135:5–16; *Id.* Ex. B, at 3, ECF No. 17-2.) However, on January 2, 2014, Dr. Sun notified Dr. Cooperman that he was not able to renew his privileges due to his stress disorder. (*Id.* Ex. D, at 3, ECF No. 17-4.)

On January 15, 2014, Director Sullivan reminded Dr. Sun that his reappointment paperwork would expire on January 18, 2014, and notified him that if he did not provide his paperwork by January 17, he would lose his privileges and might be terminated. (*Id.* Ex. B, at 3.) That same day, Dr. Sun submitted his declaration of health, declaring that he was physically and mentally fit but writing on the form that he could not find a physician to certify that he did not have any health conditions that would adversely affect his ability to practice. (*Id.* at 2.) Two days later, on January 17, 2014, Dr. Sun resigned his position at the Columbus VA. (*Id.* 122:19–24.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel,*

*Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving party to "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "summary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III.    ANALYSIS

The Court begins with what is and is not at issue here. The Court construes Dr. Sun's Complaint to raise various claims under Title VII—specifically, national origin discrimination, retaliation, hostile work environment, and constructive discharge. (Compl., ECF No. 1.) The VA's Motion for Summary Judgment addresses these claims (although it only argues against the national origin discrimination allegations in the context of its hostile work environment and constructive discharge discussions), as well as a disability discrimination claim. (Def. Mot. Summ. J., ECF No. 18.) Dr. Sun's opposition outlines why he believes he was discriminated against due to his national origin, retaliated against for protected activity, and subjected to a hostile work environment. (ECF No. 21.) With regard to national origin discrimination, Dr. Sun focuses heavily on the conduct that led him to file his 2009 Complaint. (*Id.* at 4–7.)

Dr. Sun cannot base his national origin discrimination claim on the conduct that was the basis for his 2009 Complaint. As Dr. Sun acknowledges, he received the final EEOC decision on his 2009 Complaint on or about May 1, 2013. (ECF No. 21, at 1.) Dr. Sun was required to file suit within ninety days of receiving this final decision. *See* 42 U.S.C. § 2000e-16(c). However, Dr. Sun did not file the instant action until December 1, 2017. (ECF No. 1.) Thus, any of Dr. Sun's discrimination allegations that were the basis of the 2009 Complaint are barred as untimely. The 2009 Complaint is only relevant in that it is a "protected activity" for purposes of Dr. Sun's retaliation claim.

While Dr. Sun claimed in his deposition that he was pursuing a disability discrimination claim, (Sun Dep. 198:23–199:25), he never raised such a claim in his Complaint (nor has he argued in support of such a claim in his opposition to the VA's Motion for Summary Judgment). Although Dr. Sun is *pro se*, his pleadings must still comply with Fed. R. Civ. P. 8(a). *Dotson v. Collins*, 317 F. App'x 439, 443 (6th Cir. 2008). At the very least, Dr. Sun was required to say enough in his Complaint to give the VA fair notice of what his claims were and the grounds on which they rested. *See id.* Dr. Sun did not do that with respect to a disability discrimination claim. He made no mention of any facts (or law) related to such a claim in his Complaint, so he may not now bring a disability discrimination claim.

Finally, although Dr. Sun's Complaint gave the VA fair notice of a constructive discharge claim, Dr. Sun mentions nothing about such a claim in his response to the VA's Motion for Summary Judgment. He does not even mention the fact of his resignation. Despite the VA's arguments against a constructive discharge claim in its Motion for Summary Judgment, Dr. Sun declined this opportunity to respond to these arguments. A *pro se* litigant has the same duties as any other litigant on a summary judgment motion. *Viergutz v. Lucent Techs., Inc.*, 375

F. App'x 482, 485 (6th Cir. 2010). In order to pursue a constructive discharge claim, Dr. Sun was obligated to identify specific supporting facts. *See id.* He failed to do so by failing to address the claim at all. Accordingly, Dr. Sun has abandoned his constructive discharge claim, and the Court declines to consider the merits. *See Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (per curiam) ("The district court properly declined to consider the merits of this claim because Hicks failed to address it in either his response to the summary judgment motion or his response to Concorde's reply brief.").

The VA's Motion for Summary Judgment on Dr. Sun's constructive discharge claim is **GRANTED**. The Court now addresses what remains of the national origin discrimination claim and the retaliation and hostile work environment claims.

### A.     National Origin Discrimination Based on Discrete Discriminatory Acts

A Title VII claim may be based on "'discrete discriminatory acts'" or based on a hostile work environment. *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 993 (6th Cir. 2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002)). The former type of claim involves a particular adverse employment action such as termination, failure to promote, or a refusal to hire. *See Morgan*, 536 U.S. at 114. The latter involves repeated discriminatory conduct occurring over a period of time. *Id.* at 115–16. First, the Court addresses discrete act liability, with a discussion of the hostile work environment claim following below.

Although the VA did not explicitly argue against national origin discrimination based on discrete acts, the VA essentially argued against this theory of liability in the context of the constructive discharge claim. (*See, e.g.*, ECF No. 18, at 66 n.12, 70.) The Court construes these arguments as seeking summary judgment on Dr. Sun's claims of national origin discrimination based on "discrete discriminatory acts" as well given their substantial overlap.

To establish a *prima facie* case of national origin discrimination on a discrete acts theory of liability, a plaintiff must show that 1) he was a member of a protected class, 2) he was qualified for the position, 3) he suffered an adverse employment action, and 4) he was treated differently than similarly situated nonprotected employees. *Martinez-Gonzalez v. Lakeshore Staffing, Inc.*, 750 F. App'x 463, 469 (6th Cir. 2018). The VA has not offered any evidence to challenge that Dr. Sun is a member of a protected class or that he was qualified for his position. Whether Dr. Sun was subject to an adverse employment action in the context of a national origin discrimination claim is a difficult question and need not be addressed, because Dr. Sun's claim fails regardless.

Dr. Sun has failed to offer any evidence that he was treated differently than similarly situated nonprotected employees. He has made no attempt to point to a native-born employee who, under similar circumstances, was not disciplined. *Cf. Wilson v. Chipotle Mexican Grill, Inc.*, 580 F. App'x 395, 399 (6th Cir. 2014) ("Wilson makes no attempt to point to a white or male employee who engaged in a nine-to-twelve-minute shouting match with a manager in front of customers and yet remained employed."). Thus, he has failed to establish a *prima facie* case of national origin discrimination under Title VII on a discrete acts theory of liability. *See Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001) (holding the same in racial discrimination case).

The VA's Motion for Summary Judgment as to this component of Dr. Sun's national origin discrimination claim is **GRANTED**.

### B.    Retaliation

To establish a *prima facie* case of retaliation, a plaintiff must prove that 1) he engaged in activity protected by Title VII, 2) the defendant knew about the protected activity, 3) the plaintiff

was subjected to an adverse employment action by the defendant, and 4) there was a causal connection between the protected activity and the adverse employment action. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595 (6th Cir. 2007). With regard to the third element, in lieu of an adverse employment action, a plaintiff can proceed by establishing the existence of severe or pervasive harassment (i.e., a hostile work environment). *Morris v. Oldham Cty. Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000). This hostile work environment theory of liability will be analyzed in the next section, and the Court focuses here on a claim premised on an adverse employment action. Once a plaintiff has established a *prima facie* case of retaliation, the burden of production shifts to the defendant to offer a legitimate, nondiscriminatory reason for its actions. *Morris*, 201 F.3d at 792–93. It is then the plaintiff's burden to demonstrate that the defendant's purportedly nondiscriminatory reason was pretextual. *Id.* at 793.

The VA challenges only the third and fourth elements of Dr. Sun's *prima facie* case. (ECF No. 18, at 44.) And while it preserves its argument disputing the third element, the VA effectively concedes that Dr. Sun's summary suspension is an adverse employment action under Sixth Circuit precedent. (*Id.* at 46–47.) As the VA recognizes, the Sixth Circuit has previously determined that placing an employee on two days of paid administrative leave and a ninety-day performance plan "appear[s] to meet th[e] relatively low bar" for an adverse employment action in the retaliation context. *Michael*, 496 F.3d at 596. Given that Dr. Sun was placed on a ninety-day performance plan and was put on a lengthier, six-week administrative leave, the Court concludes that Dr. Sun's summary suspension and placement on the FPPE constitute an adverse employment action for purposes of a retaliation claim. Because of this, the Court need not determine whether any of the other actions that Dr. Sun alleges were adverse constitute adverse

employment actions. Instead, the heart of Dr. Sun's claim is the fourth element—the causal connection.

To establish a causal connection, a plaintiff must proffer "'evidence sufficient to raise the inference that his protected activity was the likely reason for the adverse action.'" *Paasewe v. Action Grp., Inc.*, 530 F. App'x 412, 417 (6th Cir. 2013) (per curiam) (quoting *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 675 (6th Cir. 2013)). Dr. Sun engaged in protected activity on December 6, 2009, June 13, 2013, and September 12, 2013, when he filed EEO complaints; these are the only protected activities that Dr. Sun alleges. Thus, in order to prove a causal connection and survive summary judgment, it must be the case that a jury could infer from Dr. Sun's evidence that at least one of these complaints was the likely reason for the discipline that Dr. Sun faced.

Beginning with the 2013 complaints, it is significant that these complaints were both filed in the midst of the Columbus VA's investigation into Dr. Sun's conduct. Because the Columbus VA had already taken steps to discipline Dr. Sun, it is less likely that these complaints were the reason for Dr. Sun's discipline. That is, because the Columbus VA had already demonstrated that it was concerned about Dr. Sun's job performance several months *before* he filed these complaints, it makes it less likely that the Columbus VA's actions that occurred *after* the filing of these complaints were motivated by retaliation. *See Carroll v. Ohio Dep't of Admin. Servs.*, No. 2:10-CV-385, 2013 WL 12180001, at *8 (S.D. Ohio Mar. 29, 2013) (finding that complaints filed after employer launched investigation undercut the significance of temporal proximity), *aff'd,* 555 F. App'x 512 (6th Cir. 2014); *cf. Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet

definitely determined, is no evidence whatever of causality."). This is particularly so where both complaints were filed after Dr. Sun received the Notice of Proposed Suspension and the letter informing him that the Patient's Complaint was under review by the PRC. Indeed, Dr. Sun has offered no evidence that the disciplinary actions taken against him were in any way related to either of his 2013 EEO complaints. Rather, all of the available evidence shows that he was disciplined for, among other things, documenting patient examinations that he did not perform, having an excessive number of patient complaints lodged against him, and for questionable medical decision making in the case of the Patient.

Dr. Sun also offers no persuasive evidence that the disciplinary actions taken against him were related to the 2009 Complaint. Dr. Sun relies heavily on the fact that the EEOC denied his final appeal regarding his 2009 Complaint on May 1, 2013, and that he received a Notice of Proposed Suspension less than three weeks later on May 23, 2013. (ECF No. 21, at 1.) Notably, this Notice of Proposed Suspension alone was not an adverse employment action. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) ("[C]ourts have been unwilling to find adverse actions where the suspension is not actually served."); *cf. McMillian v. Potter*, 130 F. App'x 793, 797 (6th Cir. 2005) (finding that proposed letter of warning in lieu of suspension did not qualify as an adverse employment action). However, the Court assumes that the Notice of Proposed Suspension could still be considered as a part of the "chain of events" that led to an adverse employment action. *Cf. Vasquez v. Cty. of L.A.*, 349 F.3d 634, 647 (9th Cir. 2003) (noting that "explicitly discriminatory remarks by a subordinate may implicate the motive of the employer" because they can set in motion the chain of events leading to an adverse employment action). Even assuming this to be true, temporal proximity alone is not enough to prove causation. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010). And "[t]he

timeline of events in this case extinguishes any inference based on temporal proximity." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012).

The allegedly retaliatory activity began on October 1, 2012, when the Columbus VA began to probe the Patient's Complaint. That was almost three years after Dr. Sun filed his 2009 Complaint. Dr. Sun offers no explanation for this three-year lag nor does he provide a reason why the Columbus VA would begin to retaliate against him after his final EEOC appeal was denied but not when the 2009 Complaint was initially filed. Nor does Dr. Sun offer evidence that anyone at the Columbus VA even *knew* that his appeal was denied on May 1, 2013, or that the adjudication process remained ongoing almost three and a half years after the 2009 Complaint was filed.

The Court recognizes the fact of the temporal proximity between the May 1 appeal denial and the May 23 Notice of Proposed Suspension. However, Dr. Sun has offered no evidence that this is anything "more than coincidence, which is insufficient on its own to show causation." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010). There is no reason to believe that the Notice of Proposed Suspension was any more related to the appeal denial than any other event that may have happened in May 2009. The PRC's review, which began on May 2, 2013, and the results of Dr. Bope's and Dr. Cooperman's patient phone calls, which concluded in early May, provide additional explanations for the timing of the Notice of Proposed Suspension. Thus, the existence of the May 1 appeal denial is not a "likely reason" for the Notice of Proposed Suspension.

Even if Dr. Sun could meet his initial burden based on timing alone, that would not be enough to stave off summary judgment. At that point, the burden would shift to the VA to offer a legitimate, nondiscriminatory reason for its actions. The VA has done so in spades. The VA

conducted an extensive investigation through which it found evidence that Dr. Sun had been conducting inadequate patient examinations and documenting examinations that he had not performed, that Dr. Sun had multiple patients who had lodged complaints against him, and that Dr. Sun had potentially made a medical error in the case of the Patient. This evidence of incompetence and misconduct was a legitimate, nondiscriminatory reason to discipline Dr. Sun.

It is Dr. Sun's burden to prove that this ostensibly nondiscriminatory reason was pretextual. A plaintiff can demonstrate pretext by showing that the defendant's proffered reason "'(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Michael*, 496 F.3d at 597 (quoting *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 434 (6th Cir. 2002)). Dr. Sun makes no effort to proceed under the third of these options. Rather, he argues that the evidence against him was manufactured and that he was disciplined on account of his national origin and his prior EEO activity. However, he offers no evidence in support.

It is clear that Dr. Sun disagrees with the facts that were uncovered in the VA's investigation and with the allegations that preceded the disciplinary actions taken against him. For example, Dr. Sun insists that he did not know about the Patient's dangerously low pulse and that this was due to mistakes by the nurse and the medical resident. In an effort to construe the facts in the light most favorable to Dr. Sun, the Court assumes that Dr. Sun did not in fact know about the Patient's low pulse and was not at fault in this situation. But this is irrelevant, and it does not create a genuine issue of material fact that would defeat summary judgment. This is because what matters is not whether Dr. Sun made a medical error but whether the Columbus VA reasonably and honestly *believed* that Dr. Sun had made a medical error. *See id.* at 598 ("Michael's disagreement with the facts uncovered in Caterpillar's investigation does not create

a genuine issue of material fact that would defeat summary judgment 'as long as an employer has an honest belief in its proffered nondiscriminatory reason.'" (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001))). Dr. Sun cannot refute the VA's honest belief in his "performance deficiencies simply through [his] own contrary assertions." *See id.* at 599; *Haughton v. Orchid Automation*, 206 F. App'x 524, 532 (6th Cir. 2006) ("Plaintiff cannot rely on mere denials of Defendant's articulated reasons to show they had no basis in fact, but must produce some evidence in support of his denial to survive summary judgment.").

An employer holds an "honest belief" if it "made a reasonably informed and considered decision" before acting. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806–07 (6th Cir. 1998). The decisional process need not have been "optimal," nor must the employer have "left no stone unturned." *Id.* at 807. The VA conducted a lengthy and thorough investigative and decisional process before implementing the FPPE. And although the VA suspended Dr. Sun before the conclusion of this process, the VA was within its right to do so. Employers have a right to place an employee on paid leave while investigating complaints made against the employee. *Michael*, 496 F.3d at 597. This right is no doubt at its zenith in a circumstance involving literal life and death. The VA had legitimate concerns about whether Dr. Sun could capably care for his patients and understandably opted to suspend him while it undertook its review.

In terms of its review process, the decision of whether, and how, to discipline Dr. Sun was independently reviewed by three separate committees[3]—the PSB, the MEC, and the CPC—and Director Sullivan. Significantly, these committees and Dr. Sullivan all agreed that discipline was warranted, although their independence is evidenced by the fact that they did not all agree on the approach. The six members of the PSB unanimously recommended that Dr. Sun's clinical

---

[3] This does not include the PRC because its review was confidential. But the PRC's review did raise a "significant concern" that caused Dr. Cooperman to ask Ms. Garza to research how the VA should respond.

privileges be reinstated with "intensive oversight," a decision with which Director Sullivan

agreed. The eight voting members of the MEC unanimously voted (by secret ballot) to terminate

Dr. Sun's clinical privileges. And the seven voting members of the CPC unanimously voted to

approve the FPPE. The voting members of these three committees consisted of eighteen different

professionals, most of whom were medical providers at the Columbus VA, and *all* of them

agreed that the evidence of incompetence and misconduct by Dr. Sun merited discipline. These

separate layers of review insulate the VA's disciplinary actions from allegations of pretext. *Cf.*

*Min Li v. Qi Jiang*, 673 F. App'x 470, 475 (6th Cir. 2016) (finding that separate layers of review

of denial of tenure refuted any inference of causation).

It is also the case that two individuals who were not affiliated with the Columbus VA

agreed that the circumstances surrounding the Patient's Complaint were troubling. First, when

Ms. Garza consulted the VA's National Director of Risk Management, the National Director

recommended that the Columbus VA initiate a management review. Second, after conducting

that management review, Dr. Bixel from the Cincinnati VA concluded that Dr. Sun did not meet

the expectation that VA providers "manage their teams and trainees in such a way that critical

information will be effectively communicated." Although Dr. Bixel could not definitively assign

blame for the lack of follow-up regarding the Patient's low pulse, he recognized that Dr. Sun was

ultimately responsible for the Patient's care. Dr. Sun has acknowledged this maxim as well,

despite failing to take any responsibility for the circumstances surrounding the Patient's

Complaint. Even assuming that Dr. Sun was actually unaware of the Patient's low pulse, it was

his responsibility *to be* aware.

Dr. Sun offers three arguments in support of his claim of pretext. None are persuasive.

First, Dr. Sun accuses Drs. Bope and Cooperman of lying, fabricating evidence, and more or less

conspiring against him. (ECF No. 21, at 7.) Dr. Sun offers no evidence to support these serious accusations, and the assumptions on which he bases these accusations are manifestly wrong. For example, Dr. Sun describes a meeting with Dr. Bope in May 2013 in which Dr. Bope identified four patients who "complained about [his] physical exam." (*Id.*) Dr. Sun says that he then went to the Patient Advocate to request complaints submitted by these four patients and found that there were none. (*Id.*) From this limited information, Dr. Sun then concludes that Dr. Bope is lying. (*Id.*) However, Dr. Sun's recollection is entirely consistent with Dr. Bope's description of his investigation. Based on the evidence in the record, it seems that Dr. Bope was describing four of the patients whom Dr. Bope had affirmatively telephoned—and whom had not previously filed complaints. It is thus understandable that the Patient Advocate had no complaints submitted by these patients. Dr. Sun's argument does nothing to undercut the evidence offered by the VA.

Second, Dr. Sun bizarrely accuses the VA of "mak[ing] up a case" in order to "copy[]" a case involving a doctor at a VA facility in Billings, Montana, who was accused of improperly conducting patient examinations in 2008. (*Id.* at 9.) This random case that Dr. Sun found through searching the Internet is irrelevant. Dr. Sun offers no evidence as to why the Columbus VA would falsify information in order to simulate a then-five-year-old case from halfway across the country, nor does he offer evidence that the Columbus VA even knew about this case.

Third, Dr. Sun accuses the Columbus VA of setting him up to fail. That is, he insists that the FPPE "was a test to see if each of [his] patients could recall and properly describe the physical exams that [he] did for them." (*Id.* at 11.) This is not an accurate depiction of the FPPE. The FPPE mandated that a physician reviewer would call most of Dr. Sun's patients within 24 hours of their visit. (ECF No. 18-5, at 199.) The only exception is that Friday patients could potentially be called as late as the following Monday. (*Id.*) Dr. Sun offers no evidence that this

plan was unreasonable or that his patients would not have been able to recall within three days of their examination (at the very latest) whether Dr. Sun had examined particular parts of their body. Regardless, Dr. Sun offers no evidence of his patients' memory issues during the two days in which he complied with the FPPE. In order to defeat summary judgment, Dr. Sun must offer facts, not hypothetical scenarios.

This argument is also significantly less persuasive in light of the fact that several of the patients with whom Drs. Cooperman and Bope spoke said Dr. Sun did not examine them *at all*. While a patient may well forget certain aspects of an examination, it seems highly unlikely that a patient who had been examined would not remember any examination having occurred at all.

The Court also finds it significant that the Columbus VA made a demonstrated effort to retain Dr. Sun. After the MEC recommended that Dr. Sun's clinical privileges be terminated, Director Sullivan could have agreed with this decision and terminated Dr. Sun. He did not. He kept Dr. Sun on staff with a plan that would allow him to be monitored for a limited period of time. Similarly, rather than sit back and let Dr. Sun's clinical privileges expire, the Columbus VA made repeated efforts to try to get Dr. Sun to renew his expiring privileges. While the Columbus VA made great efforts to try to retain Dr. Sun, Dr. Sun's only response was to complain about the FPPE and try to transfer to another VA facility.

The VA's Motion for Summary Judgment as to Dr. Sun's retaliation claim is **GRANTED**.

### C.     Hostile Work Environment

A plaintiff can assert a hostile work environment claim by alleging that the harassment that he suffered was motivated by discrimination or that it was motivated by retaliation. *Broska v. Henderson*, 70 F. App'x 262, 269 (6th Cir. 2003). The standard is the same in either case. *Id.*

The Court construes Dr. Sun's hostile work environment claim as being premised on both discriminatory animus and retaliatory animus.

To establish a hostile work environment claim, the plaintiff must prove that 1) he was a member of a protected group (or engaged in protected activity), 2) he was the subject of unwelcome harassment 3) based on that protected status (or protected activity), 4) the harassment affected a term, condition, or privilege of employment, and 5) the defendant knew or should have known about the harassment but failed to correct or prevent it. *Michael*, 496 F.3d at 600 (discriminatory animus); *see Akers v. Alvey*, 338 F.3d 491, 497 (6th Cir. 2003) (retaliatory animus). It is not enough for a plaintiff to prove that he was a member of a protected group, or engaged in protected activity, and that he was harassed. He must prove that he was harassed *because of* that reason. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Choulagh v. Holder*, 528 F. App'x 432, 437 (6th Cir. 2013) ("[T]he harassing acts are not part of the hostile work environment analysis if there is no proof that the harassment was based on national origin."). The harassment at issue must also be "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . .'" *Harris*, 510 U.S. at 21 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Id.*

Dr. Sun's hostile work environment claim fails on either theory of liability because he has not offered sufficient evidence to prove either that he was the subject of "sufficiently severe or pervasive" harassment or that any harassment that he might have suffered was based on either his national origin or on protected activity. The only "harassment" that Dr. Sun alleges are the

disciplinary actions taken against him. However, the imposition of disciplinary action is not sufficient to constitute "severe or pervasive harassment." *See Michael*, 496 F.3d at 601.

Similarly, Dr. Sun complains that the strict oversight outlined by the FPPE constitutes harassment. However, Dr. Sun has not offered any evidence that his supervisors were not permitted to monitor his work. *See Broska*, 70 F. App'x at 270 ("Broska does not deny that it was the job of his supervisors to physically inspect his manual work."). Rather, all available evidence shows that it was their *responsibility* to do so, particularly given that the lives of Dr. Sun's patients were literally at stake. Instead Dr. Sun objects to being the subject of their supervision. But the Bylaws specifically provide for an FPPE involving "direct supervision and appropriate actions on privileges" if "there is concern regarding competence" and patient care. As was outlined above, the Columbus VA permissibly acted based on the concerns that it legitimately had surrounding Dr. Sun's competence and reliability. "[A] reasonable jury could not find that the disciplinary actions were unjustified in light of [Dr. Sun's] workplace behavior." *Choulagh*, 528 F. App'x at 438.

Lastly, Dr. Sun cannot link any supposed harassment to his national origin or protected activity. With regard to the latter, Dr. Sun offers no evidence to support the argument that the FPPE was instituted because of his 2009 Complaint, except for the spurious temporal evidence debunked above. With regard to the former, the only evidence of discriminatory animus that Dr. Sun puts forward are three statements that Dr. Bope made at the MEC meeting. First, Dr. Bope remarked that, in his experience, foreign-trained students often have difficulty applying their skills to the modern technology in the United States. Second, Dr. Bope expressed a concern about the inability to verify the adequacy of Dr. Sun's basic medical education. Third, Dr. Bope commented that he finds Dr. Sun difficult to understand.

These three comments are not enough to sustain Dr. Sun's hostile work environment claim. As for the first statement, Dr. Bope specifically stated that, in his experience, foreign-trained doctors "are very strong in things like the physical exam and diagnostic" and where they have difficulty is "applying that to the modern technology" in the United States. There is no evidence that Dr. Sun was subjected to discipline because of his inability to apply his medical training to American technology, nor does Dr. Sun allege that he was. In fact, the bases for the VA's disciplinary actions were exactly the areas in which Dr. Bope opined that foreign-trained doctors' skills are normally very strong—conducting physical exams and diagnostics. As a result, this statement is no evidence of discriminatory animus towards Dr. Sun.

Regarding Dr. Bope's second statement, his concern had nothing to do with the fact that Dr. Sun was Chinese or even that he received his medical training in China. Rather, Dr. Bope was concerned, based on the evidence before him, that Dr. Sun's medical training was inadequate, and this concern was exacerbated by the VA's inability (or, at least, assumed inability) to verify the adequacy of Dr. Sun's medical training. It is not clear from the record whether Dr. Bope did not think that he could verify the adequacy of Dr. Sun's medical training because Dr. Sun had gone to medical school in China or because the evidence uncovered in the VA's investigation raised concerns about the adequacy of his training. Dr. Bope's stated concern is ambiguous at best. But even construing this statement in the light most favorable to Dr. Sun as being related to Dr. Sun's graduation from a Chinese medical school, there is still nothing about this statement that indicates discriminatory animus towards Dr. Sun. Dr. Bope was concerned about the inability to verify the adequacy of Dr. Sun's education, not about where he was educated.

Finally, Dr. Bope expressed that he has difficulty understanding Dr. Sun. Comments regarding an individual's accent can constitute direct evidence of national origin discrimination. *Igwe v. Salvation Army*, No. 19-1082, 2019 WL 5424692, at *4 (6th Cir. Oct. 23, 2019). However, "[i]solated and ambiguous comments are insufficient to support a finding of direct discrimination." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 239 (6th Cir. 2005). In addition, context makes clear that Dr. Bope's comment was rooted in something other than discriminatory animus. Dr. Bope expressed his concern in the context of whether an FPPE would be effective or whether Dr. Sun's accent and English skills would inhibit his ability to work under a preceptor. This is important because, as Dr. Sun concedes, Title VII allows an accent to be a factor in an employment decision if it materially interferes with the individual's job performance. (ECF No. 21, at 4.) Also important from the context of Dr. Bope's statement is that Dr. Bope explained that he finds Dr. Sun difficult to understand not only because of his English, but also because of Dr. Sun's unfocused communication style. Difficulty speaking in a clear and linear fashion is a nondiscriminatory basis for Dr. Bope's frustrations surrounding his difficulty understanding Dr. Sun.

Because Dr. Sun has offered no persuasive evidence of national origin discrimination, even if he did suffer harassment, there is no evidence that it was because of his national origin. The VA's Motion for Summary Judgment as to Dr. Sun's hostile work environment claim is **GRANTED**.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED**.

/s/ Sarah D. Morrison

**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**